The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Catherine E. Zenoff presiding. Good morning, counsel. This matter is case number 424-0690, Bruce Smolucha, and I don't know if I've correctly pronounced the name, versus PSNERGY, LLC. Would counsel please identify yourselves for the record? Counsel for the appellant first. Good morning, Your Honor. This is Dan Nolan. I'm counsel for the appellant. Good morning, Your Honor. My name is Margaret Rhodes. I'm counsel for the appellate. Thank you very much. Mr. Nolan, you may begin your argument. Good morning, Your Honors, and may it please the court. As I just stated, my name is Dan Nolan. I represent the appellant in this matter, Bruce Smolucha. His last name has been mispronounced throughout the whole case, so that's quite all right. I understand that I am afforded 20 minutes here for the main argument pursuant to Rule 110, with five minutes reserved for rebuttal. As this honorable panel is well aware, we are here today regarding Smolucha's appeal on the trial court's order striking the Illinois Supreme Court Rule 191A affidavit of his industrial machinist expert, John Green, and the granting of summary judgment in favor of the defendant, PSNRG, LLC. Unless there are specific questions from the panel, I will begin my argument. Is there a number of different issues to address here? Counsel, good morning. I actually wanted to start with a question regarding the affidavit, Mr. Green's affidavit. How do you contend that this affidavit is based on the pertinent and correct facts? For example, while he did attend the inspection and observed the furnace, where was there any reference in this affidavit to data collected during the tunings or the combustion process, for example? I mean, there were references to the testimony of the employees who inspected and went to the plant, but where are their specifics in this affidavit? Thank you, Your Honor. The affidavit lays out that Mr. Green is familiar with this type of machinery and during the inspection was able to evaluate and understand that this is the type of machinery he has been familiar with in the past. The issue in taking measurements at the actual inspection does not necessarily go to the issues of causation or duty and breach in this case. The inspection itself took place far after the January and February incidents in this case where we do have evidence specifically one day after the plane of second poisoning that there were elevated levels higher than the 500 ppm industry standard quantified by the defense of CO in the exhaust stacks. So the fact that Green in his affidavit didn't testify as to measurements taken at the inspection I don't think necessarily goes to the issues in the case as to why he was retained. His affidavit more so lays out his familiarity with the machine and his familiarity with the standard of care applicable to industrial machinery experts specifically in the combustion tuning field. But counsel these 191 affidavits have a little higher standard than if he were to testify as an expert during a trial, isn't that correct? I mean I think that's why we're focusing on this. Your honor I agree that the 191a affidavit is made in lieu of trial testimony in this specific instance. The issues with the court striking the affidavit based on his qualifications and then on the other hand based on what the court determined was speculative or misstating the I think are fleshed out in the briefs a little bit more where it's plaintiff's position that the court took a leap here in disqualifying Mr. Green without the benefit of any cross examination any voir dire an actual fry motion whereas his qualifications were laid out in the affidavit and the cv attached to the affidavit that does show he has 40 years of experience with this type of specific type of annealing machinery. So his familiarity with that dating back to the 1980s and the standard of care applicable to tuning these machines is ultimately what should have qualified him to render opinions and the 191a standard which I believe is set out in the Bailey case states that an expert may testify apologies one moment an expert may testify based on on his personal knowledge and self shall set forth particularly with the facts upon which the claim is based shall attach all documents and as to which he relies upon and shall affirmatively show that if the defiant if sworn as a witness can competently testify thereto and the trial court in striking the affidavit in totality based on his qualifications ignored the 40 plus years that Mr. Green had with experience with this type of machine and two further furthermore if the trial court were to have struck the the portions of the that did not conform to 191a specifically on speculation the Bailey court also tells us that only the tainted portions of that affidavit should be stricken and the remaining portion should be considered by the court which was not done here but isn't that why we have a higher standard for 191 affidavits because the expert is not subject to cross-examination you made mention about a fry hearing but that's why the affidavit has to be detailed and include everything and attach everything that they rely upon I would agree your honor and there hasn't been a position taken that certain documents were not attached to the affidavit the affidavit it was the defendant made the argument the affidavit should be stricken based on Mr. Green's qualifications which the court agreed that was unqualified despite what I've already stated his 40 plus years as an industrial machinery expert who's worked on these types of machines and his familiarity with the standard of care applicable to combustion tuners who should be servicing these types of machines counsel I had another question not specifically relating to this affidavit we certainly can come back to that if we need to but you agree I believe that PSN was on site for two days per year to perform maintenance specialized services I would say specialized services on this furnace owned and operated by PTC so are you suggesting by your arguments and what you've put in your brief that PSN owed a duty to everyone who came into this plant this Fairfield facility the the argument set forth in the appellant's brief touches upon I first I'll back up I would agree that PSN has made it evident that they they should be on site every six months to tune these furnaces and this this goes to the specific argument in terms of the timeliness in addressing the call to address the CO issues so yes I would agree that PSN should be on site twice a year but if they if they undertake that duty to come address the CO issues and as laid out in the brief take more than three weeks to arrive which was also in excess of the every six months to treat this furnace then the then the duty to have performed that in a timely manner was voluntarily undertaken which with in accordance to the non-feasance standard of the restatement under 324a would impart a duty onto those foreseeably who could be injured by the negligent undertaking of performing that timely combustion tuning well what would the magnitude of that duty be then wouldn't that be too great for any anyone to undertake in this in the context of this case of this business though I I would disagree your honor I would think the magnitude of the burden would be to to ultimately do what they said they would do which is if you're if they received a call to come tune the furnace they would do that in a timely fashion and they and they would know that that should have been done within the six months or alternatively if there was CO issues as reported to PSN that that should have been done at an emergency basis due to the dangers posed by carbon monoxide which the PSN employees had testified they were aware of well but now wasn't tuning different than repair of the furnace as a whole and looking into PTC's ventilation system I think you're that they had voluntarily undertook a much broader job I would agree and disagree your honor I I would say when PTC the the factory called and said hey we need you to come address these CO issues and PSN agreed to do that they did expand their duty outside of tuning the furnace but alternatively when they were called to come and and check out the CO issues they did come to tune the furnace and that's what they ultimately did however they came they came too late where the plaintiff was poisoned before they came and tuned the furnaces and actually moved those two tuners those four tuners down from above the 500 ppm industry standard back to acceptable levels so that was done on the 27th which was one day after the plaintiff's second poisoning whereas its plaintiff's position that should have been done sooner or even better in a time in a timely fashion that would comport with the once every six months requirement that PSN had with these PTC factories I guess I had one other follow-up question in this case really wasn't it undisputed that wasn't there undisputed testimony that this system this furnace system would never produce unsafe levels of CO that yes your honor and I that was addressed in the brief that that is what I believe Mr. Wyant the PSN employee said that even though there's some industry standard to keep these exhaust levels below 500 ppm he stated that even if they are above 500 ppm it's still it's still somehow safe it's plaintiff's contention that's if that's pure ipsy dixit and Mr. Green is qualified to testify as to those exceeding those standards is dangerous and even that the 500 ppm standard is a self is a standard self-utilized by PSN and and the fact of the matter is that this industry standard even if taken as true of 500 ppm was exceeded in four of these stacks by up to I believe even 18 times the amount uh showing that if the tuning was would have been done prior to the plaintiff's second poisoning it's it's more likely true than not that the CO issues that uh the factories was experiencing would not have contributed to the plaintiff's inhalation of CO and the work order of PSN even specifically states by that was authored by Mr. Stallard that the high fire the high levels of exhaust from those four um four burners were in his words only slightly contributing to the CO issues in the plant so there is an admission in the testimony and the work order that the four burners that were exhausting levels higher than 500 ppm were contributing to the CO issues in the plant is there some place in the record that we can find evidence that PSN actually did agree to correct PTC's CO problems what can we look to I believe that was testified in the position of Mr. Stallard where he alluded he testified that there was a call rendered by PTC that there were CO issues in the plant and that the uh to the combustion tuning had to be moved up for that emergency purpose um if I let me see if I can pull up the so you're just saying by voluntarily responding to that phone call by voluntarily responding that phone call to address the CO issues relayed to PSN by PTC they had a duty to do that in a timely fashion especially because they labeled it as an emergency and knew the dangers of carbon monoxide and even if you were to put all of this aside they were due at the six month interval to tune this this furnace in or about January 13th which would have been six months after the last tuning in July which tuning and repair and maintenance are two different things in this industry isn't that correct I mean I'm certainly not an expert and learned from reading about this but based on what I've read they're not one in the same and that the trial court did latch on to that a little bit I would agree with you that tuning and repairing aren't the same thing but tuning and maintaining are are words that can be interchangeable tuning tuning is a process where and I'm sure um the the panel is familiar with the the briefs and the the complicated um ins and outs of how these furnaces work where the basically these burners in these furnaces degrade over time and tuning comes in uh tuning uh service team comes in to bring them back to um proper ratios where they're where they're going to be firing so that they are not exhausting levels of over 500 ppm I would it would be plaintiff's contention and Mr. Green uses the word maintained in his affidavit which the trial court latched on to that tuning and maintaining are are similar or one and the same because it's they're both processes used to keep the uh the the tubing system at its status quo so I would agree with the court that repair and tuning are not one in the same but maintaining and tuning would be but where do we have any documentation of a contract between them that they agreed to repair these stacks I mean they have invoices that agree to the tuning sure but where is the relationship that they agreed to come in and repair I I you and I would I would agree that that's that's a more of a stretch um the the the maintaining issue and the tuning issue are are more on point here than than the repair um issue which uh the trial court and defendants uh did make note that there are differences there but the the maintenance of these burners and the tuning of these burners uh it would be plaintiff's position are one in the same and uh were required of PSN um to do those in a timely fashion you're saying maintenance and tuning are the same thing that's that's what Mr. Green um would say and and I believe the if if we go to the letter of the definitions of the word tuning and maintaining are the same or similar and he has factual support to support that opinion in his affidavit that there's concrete evidence in this case that we can look at that there was an agreement that maintenance and tuning are the same and that included what you're arguing they should have repaired the stacks if there was a co leak your honor I'm not sure if that's concretely laid out but I I am I obviously have reviewed his affidavit ad nauseum in the and the allegations in the complaint and there are uh the utilization of the word maintained um is common throughout the affidavit um and again perhaps this could have been fleshed out more with cross-examination at some point but that's not uh that was not the the factual pattern in this case I know there there are a number of other issues including duty breach proximate cause and my time is running short obviously um I can give a quick uh bird's eye view as to one of those if the court has specific concerns on any of those three other arguments or we can continue to address the 191a arguments um if there are further reservations whatever you'd like counsel um I I think I'll get through this quickly I I think the one of the important errors the plaintiff the appellant finds with the court's ruling is the of duty and breach where in the court's opinion it has ultimately made a determination that there was no violation of the standard of care um based upon solely what Mr. Wyatt and Mr. Stallard testified to um the the the consideration of a duty versus a breach of duty is laid out um I think very well in the in the Burger King case I think it's Marshall v Burger King where the court determines or the court has the Supreme Court has explained to us that the existence of a duty and whether or not those duties were breached are two entirely separate considerations to be made where the breach of the duties is for the trier of fact and weighing the evidence of in this case what would be Mr. Green versus the PSN employees is also for the trier of fact as well and I see my time's up if I can just give a quick conclusion unless there's specific questions that would be better utilizing the time go ahead and finish your sentence counsel and then you'll have time on rebuttal okay um the the the conflation issue here I I think is is concerning because the trial court specifically noted in its order that a reason for granting summary judgment was that it found that there was no violation of the standard of care which ultimately is a question of fact for the jury to be weighed um against plaintiff's witnesses versus defense witnesses uh I will reserve the rest of my time for rebuttal but I thank you for the pointed questions to the panel thank you Ms. Rhodes good morning and may it please the court um we fortunately touched on a lot of what uh why I would have wanted to talk about I unless there are any specific questions at the onset I do want to clarify some of the factual issues that were brought up by the appellant in terms of this industry standard um appellant's understanding of the industry standard comes from himself as a layperson why it as an expert in combustion tuning very clearly explained that that industry standard of 500 parts per million his own personal standard of being 75 parts per million relates to the conclusion of tuning there's an understanding that that the amount of carbon monoxide that's going to be exhausted will exceed that that is is expected the data that he looked at from the January 2018 tuning was as he described it a combustion system in good condition especially given where it had been in the four years they had been working on it so when plaintiff is using industry standard of 500 parts per million to conflate it with the maximum allowable exhaustion of carbon monoxide that's simply not correct that doesn't come from his expert that comes from um a lay person's misunderstanding additionally this recommendation of six months of tuning and responding timely to an emergency tuning call um your honor xenoph made the very pointed um point that there's undisputed testimony that this furnace could have been allowed to be untuned indefinitely and it would never produce amounts of carbon monoxide that would be hazardous to human health that recommendation of six months the recommendations that are made in the work service orders all relate to efficiency the purpose of combustion tuning is to maximize the heat that is used by the furnace without wasting gas so um for example with the industry standard of 500 parts per million if at the end of tuning you still have 500 parts per million of carbon monoxide being created you're just wasting that gas you have to go back and retune for efficiency's sake not for safety's sake i think that the timeline here is very important um ps energy came out in july of 2017 they performed tuning plaintiff can offer no evidence that they did it inadequately at some point in january of 2018 ps energy was contacted in order to perform tuning in either the later part of january or the early part of february they came out and they ended up tuning in january 26th at that point in time plaintiff had had some vague symptoms in the week prior but his first hospitalization where there was actual medical record of elevated carbon monoxide wasn't until the 27th the day after ps energy performed the tuning after the tuning was performed they took their final readings there were zero parts per million of carbon monoxide being exhausted from those 28 exhaust stacks so in short in terms of causation at that point in time before plaintiff's first affirmative exposure to carbon monoxide the combustion system could not have been a source it was exhausting zero parts per million plaintiff ended up being exposed to elevated levels of carbon monoxide on the 27th of january the 29th january and then february 16th there is no evidence that the combustion system was producing carbon monoxide in any amount on any of those days so so counsel if i could shift our focus for just a minute and go back to mr green's affidavit and some of the things we talked about i talked about with opposing counsel if we look at mr green's affidavit there are many paragraphs many references to testimony and a lot of detail appears in this affidavit so why weren't there why why why can we say or why can opposing counsel say that i'm sorry why do you say it wasn't based on facts that was one of the questions i had but if we really look at it carefully what was wrong with this affidavit that is an excellent question i have spent quite some time combing through this affidavit i think at one point in time i had it memorized in my motion to strike i had an addendum that took it paragraph by paragraph with each allegation each opinion and then i compared it to the record in most of these scenarios i have it pulled up right now for example at one point he he had an opinion that there was a crack that wasn't fixed if you go back to the the testimony related to that crack it was all hypothetical the witness started off by saying well we didn't know if there was a crack or not the majority of the affidavit relies on the testimony of the the two ps energy technicians wyant and stallard if you go to each of the citations that are referenced yes those words exist in the testimony excess carbon monoxide running rich high carbon monoxide however they provide a context that that just means there was carbon monoxide in the exhaust there was carbon monoxide at the end of this complicated chemical process the affiant mr green cherry picks those words and applies his own definition to them he never explicitly says this machinery should never exhaust carbon monoxide and therefore the fact that there was any carbon monoxide is a problem he just takes their words at face value that there was more carbon monoxide than there should have been but that's not the context that's that's the main issue i would say with his affidavit um but it does take a careful reading of both the affidavit and the record to match up what he claims um and establish why it's either speculation conjecture or just a misstatement of the the testimony well do you agree that the trial court here should have just stricken the parts that did not meet the requirements of 191a i mean isn't that what is usually done i would say that's a two-part question because if defendants had just moved to strike it on the basis of it being based in speculation conjecture or misstatement of the evidence then yes i imagine the trial court should have taken a red pen and crossed out what was inappropriate but the trial court also found that he was generally not qualified to render opinions about this system combustion tuning as a whole or what should have been done in this case making it appropriate to strike the entirety of the affidavit he's simply not an expert who can make any opinion about the subject matter he's talking about well the court did that without any voir dire or i mean it was uh pretty arbitrary was it not i would disagree generally um i i think in any other situation the ability to put forward your experts opinions without subjecting it to cross-examination criticism or impeachment should have been of benefit his opinions didn't have to undergo an analysis and should have been able to just be put forward unfortunately in this particular situation the facts simply don't support the plaintiff's position and mr green can't pull facts out of a magic hat and make them real so i would say the matter was ripe for summary judgment when it was filed plaintiff had an opportunity to ask the court to continue the motion and proceed with expert discovery that didn't happen he took the opportunity to file a 191a affidavit put his experts opinions before the court without subjecting it to cross-examination and unfortunately that expert wasn't qualified and the opinions aren't substantiated by the facts and the record um i want to talk a little bit unless anyone else has any other questions about the marshall case that plaintiff brought up and we have we did initially touch on this idea of the magnitude of the burden placed on defendant and the consequences of placing the burden of certain duties on the defendant that came up pretty early on in plaintiff's argument so i do just want to circle back to it marshall does not apply in this particular situation the four factors that are discussed in marshall relate to the reasonable foreseeability of injury and the likelihood of injury both of those in this particular case can be lumped together because as we discussed previously this furnace that particular combustion system the gas used at the onset of the chemical reaction is not going to produce enough carbon monoxide to be hazardous to human health it can be left untuned indefinitely without creating a risk of injury more importantly the two other factors the magnitude of placing the burden on defendant and the consequences of placing the on the defendant i think speak quite loudly in this particular instance this furnace was owned operated maintained and repaired by ptc or a third party that ptc hired ps energy was on site maybe two days per year for one day working on a very specialized portion of the furnace placing the burden on ps energy to ensure good air quality in the facility to ensure that the furnace is adequately repaired or that even the combustion system is repaired would be quite high of a magnitude and would be much of a burden on ps energy but counsel didn't they voluntarily undertake that burden when they showed up pursuant to the phone call that was made in january with regard to this unusual if not an emergency situation that is an excellent question the evidence is a bit vague on one what communication was had between ptc and ps energy during this alleged phone call that's never been fleshed out that's not in testimony brian stallard i believe testified that any communication between ptc and psn would have been with one of the owners not with him he testified that his understanding of what was going on was given to him by one of his bosses at psn so this isn't coming directly from ptc there's not an established agreement between ptc and brian stallard about what he was expected to do while he was there more importantly there is no evidence about what was communicated or what was agreed to there is nothing in the record that plaintiff can point to to say ptc contacted ps energy to investigate elevated levels of carbon monoxide in their facility it was brian stallard's understanding that he was there to ensure that the combustion system was working appropriately and then to conduct their typical tuning when he arrived part of voluntary undertaking is that it it applies limited to what was actually affirmatively undertaken and is construed very narrowly without more evidence of what if anything he was expected to do or had agreed to do um plaintiff can't meet his burden what we do know based on the purchase order is that it was agreed that they would perform their typical combustion tuning services and he did so um as i mentioned it was his understanding that he was to check on the way the combustion system was the source of any elevated levels of carbon monoxide there is no evidence that he didn't or he he it was a system that was according to wyant who looked at the data in good condition i would disagree that there was any voluntary undertaking related to that january phone call except we've got these various i mean we know that they wore the co monitors when they came and they also took readings each of the times that they were there during that time in january so why wouldn't that suggest that their undertaking was to look at even if they were doing a tuning at the time look at the issue of the carbon monoxide so the carbon monoxide interestingly enough is that data that they take with their probes in addition to the gas and air pressure that helps inform them if tuning is being done correctly so it's meant to be a data point for the purpose of tuning it's not meant to be a safety situation or for them to ensure that the combustion system is not exhausting elevated levels of carbon monoxide the use of their carbon monoxide detectors is for personal protection that is so that they know when they're walking into an industrial plant like that that they are not being exposed to elevated levels of carbon monoxide so in addition to that a big part of voluntary undertaking is also the increased risk to the plaintiff and then a reliance in this particular instance the other element to this is that there's no evidence that ptc opted to forego any sort of carbon monoxide investigation or hired any other any other entity to help alleviate this alleged elevated levels of carbon monoxide there's absolutely no evidence that there was a reliance by ptc on psn in order to effectuate this um also i don't know if you can hear me my microphone's been a little wonky today so if they're undertaking well they're measuring co for their own protection but the co levels are so critical to everyone's safety and they're uh if they find elevated or a risky level that may affect the employees in the plant do they not have an obligation then at that point or a duty to do something about that or to inform the the people in the plant that their safety may be at risk i would say generally yes i don't think that that's what we're dealing with here though because there are no facts that they discovered any elevated levels of carbon monoxide their carbon monoxide monitors that they use for their own personal safety never went off um i think you've proposed a good hypothetical but i think it's just that that i imagine they would have a duty i don't think it's applicable here based on the facts and and just to follow up on that is there any evidence in this case at all that uh there was co being emitted uh from the machinery that that psn was uh examining was leaking any co into the plant so um i imagine there's a distinction between exhausting and leaking um i don't know that there was any evidence that there was any carbon monoxide leaking from the inner workings of the tubes that are inside of the furnace however that chemical reaction has to go somewhere after it's completed um so there are 28 exhaust stacks so there would have been some amount of carbon monoxide the readings that were taken the final readings that are taken after tuning that occurs at the very end of the uh the chemical reaction before it enters the elbow shaped exhaust stack goes up hits the dilution period where general atmosphere is added and then is ultimately exhausted into the general atmosphere 10 feet up so yes i the the combustion system produces carbon monoxide i don't think we've ever um denied that but um if your question is whether it was leaking from somewhere other than where it was supposed to be normally and anticipatorily exhausted i think the answer is no and then i do just want to very briefly in my last two minutes unless anyone has any other questions discuss this conflation of um duty and breach the plaintiff brought up i think it's pretty apparent from the court's order the analysis that she used and i understand this is a de novo review but i agree that it's the appropriate analysis and i would kindly ask this honorable panel to take it into consideration you can't talk about breach without duty an act or omission is not a breach unless there was a duty to act or refrain so in this particular instance the court as a question of law made a determination about the scope and range of ps energies duty that was firmly within her purview she established it in the court order to perform combustion tuning services from there because this is a summary judgment motion she had to look at what if any evidence was offered by plaintiff to establish that that was not met or that duty was somehow breached appropriately she decided or it was made obvious plaintiff had proffered no evidence related to that specific duty plaintiff's entire focus had been on the duty he was attempting to assert the purpose of summary judgment is for judicial efficiency things that would normally be under the purview of the trier of fact can be evidence that the plaintiff will ever recover in this particular instance because plaintiff offered no disputed evidence no contradictory evidence the trial court was left with the only decision which is defined there was not a breach because plaintiff had proffered no evidence that there was um in my last 10 seconds i do just want to thank you all for your time and that's all i thank you mr nolan thank you panel i've got a couple of um issues i'd like to speak about um appellee's argument my co-counsel or my colleague here has stated accurately that the 500 ppm industry standard put forth by psn relates to the conclusion of tuning and i think that's important to note here because when the tuning is done properly it would take whatever ppm was being exhausted down from whatever that number is to below 500 ppm and ultimately if this tuning was done timely the four areas that were uh exhausting levels higher than 500 ppm would have been tuned and brought down below that threshold in a timely fashion to have avoided the plaintiff's january 26 poisoning now there was talk about the fact that the first the january 26 poisoning didn't render any cohb levels but the plaintiff also put forth an affidavit from his pmr expert who's also a inhalation expert who did opine that the plaintiff was poisoned on january 26 by carbon monoxide and that affidavit was not stricken by the court and the court has also taken judicial notice of the dangers of co levels now there were questions asked by one of your honors regarding whether or not there was any leaking outside of the exhaust stack and if we look specifically at the january 27th work order this is taken directly from it quote four of the 28 tubes had high initial co readings and zone three was smoking at low fire this would have contributed only slightly to the co plant issue so we have here direct evidence that zone three of these burners was smoking at low fire and that mr stallard who authored this report does admit that the high initial co readings were contributing to the co plant issue and now there's there's been also discussion about the genesis of this uh call from ptc to address the carbon monoxide issues and there is testimony from mr stallard on page 95 of his deposition questions so ptc first reached out about this carbon monoxide issue on january 3rd 2018 true answer yes question and whether it was labeled as an emergency for one reason or the other ps energy didn't get out there until january 26 2018 true answer yes that has been addressed in appellant's brief and also been addressed in brief where they say on rehabilitation he changed his testimony but ultimately that is a question of fact for the jury to weigh for that witness he affirmatively testified yes to both of those questions i'd uh plaintiff posed that there was a communication beginning as early as january 3rd about carbon monoxide issues and that ultimately psn didn't arrive until january 26 and again even if we put that all all aside about the co issue six months prior to or i'm sorry six months after the previous tuning would have been january 13 2018 which is again um would have been earlier than the january 26 poisoning so to wrap up here the trial court's order striking the 191 affidavit of green and granting summary judgment was ultimately in plaintiff's position made an error and the court is effectively the trial court effectively inserted itself as a juror in disqualifying green without any cross-examination vaudeer and striking the entire affidavit instead of only those parts that deemed not to meet the reasonably competent to testify 191a witness standard then the court conflated the issue of duty and breach in determining that psn had no duty and that no industry standards were breached despite clear evidence that the 500 ppm standard was exceeded up to max or which is over 18 times the industry ppm in the that's made of evident in the work orders and then the court ruled that there was no approximate cause despite the farrell and the donaldson ruling rulings which tell us that psn need only be a contributing cause without any quantification in order to create a viable claim and again we have that contributing clause evidence directly from the work order so the plaintiff in sum would respectfully request that this honorable court reverse the trial court's granting of psn's motion to strike the 191a affidavit and the psn's motion for summary judgment and remand the case for trial i uh i thank each of the uh your honors on the panel for their time and consideration of this uh appeal and unless there are any other questions i see that my time is up thank you justice vansell do you have any further questions i don't justice guichaud i do not thank you thank you very much counsel for your arguments this morning the court will take the matter under advisement and render a decision in due course